UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
    CHERYL SMITH,

                                Plaintiff,

            -against-                     1:12-cv-04374 (ALC) (GWG)

    BARNESANDNOBLE.COM, LLC,      OPINION AND ORDER

                                Defendant.

-----------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**

       Louis K. Smith ("Smith") brought claims of direct and contributory copyright infringement against Defendant BarnesandNoble.com ("Defendant" or "Barnes & Noble"), based on the fact that a free sample of Smith's book remained in a single customer's cloud-based storage locker after Smith terminated his distribution agreement.

       Smith had entered into an agreement with an online eBook distributor to make a book he authored available on both the distributor's own website and the websites of its retail partners. Defendant was such a partner, and it made Smith's book available for sale on its website. Under Smith's agreement with the distributor, and the distributor's agreement with Defendant, the websites also made available a free sample of Smith's book. If a customer obtained a sample of the book through Defendant's website, a listing for it was added to a "digital locker" associated with that customer's account, allowing the customer to later access the sample through the website, through Defendant's proprietary software, or through an e-reader device. The sample was stored either locally on the customer's device or in Defendant's cloud storage system. In the time Smith's book was on Defendant's website, no customer purchased it, but a single customer did save the free sample of the book to his digital locker.

1

In October 2011, Smith ended his agreement with the ebook distributor. Defendant learned of the termination of the agreement in April 2012 and immediately removed the book from its website. However, Defendant did not remove the book sample from the digital locker of the lone customer who had requested it. On two occasions after the book was removed from the website, the book was downloaded from the cloud to devices associated with the customer's account.

On the basis of those two downloads, Smith sued Defendant for direct copyright infringement and contributory copyright infringement.[1] Following Smith's death, his widow Cheryl Smith ("Plaintiff") was substituted as plaintiff. (ECF No. 41.) At the close of discovery, Plaintiff and Defendant each moved for summary judgement on all claims. (ECF No. 69, 73.) The Court finds that Barnes & Noble did not engage in volitional conduct sufficient to support a claim of direct copyright infringement. Further, even if the third-party customer could be found to have directly infringed on Plaintiff's copyright, Barnes & Noble cannot be held liable for contributory copyright infringement, as its digital locker system was capable non-infringing uses. Therefore, Defendant's motion for summary judgment is GRANTED in full and Plaintiff's Motion for Summary Judgment is DENIED.

## BACKGROUND

Smith was the author of an eBook titled The Hardscrabble Zone ("Hardscrabble" or the "book"). (Pl. 56.1 Stmt., May 11, 2015, ECF. No. 70, ¶ 3.) In September 2009, Smith created a user account with an online eBook distributor, Smashwords, Inc. ("Smashwords). (Pl. 56.1, ¶ 5; Def. 56.1 Stmt., May 11, 2015, ECF No. 75, ¶ 2.) In exchange for a small fee, Smashwords made its users' books available for sale and sampling both on Smashwords's own website and on the

---

[1] Smith also brought a claim of unfair competition, on which the Court previously granted summary judgment to Defendant. (ECF No. 37.)

websites of its retail partners. (Def. 56.1 ¶¶ 3-4.) In December 2009, Smith uploaded his book to Smashwords, in the process electing to charge customers $3.33 to download his book and authorizing Smashwords and its retail partners to post a free sample of 33 percent of Hardscrabble. (Def. 56.1 ¶¶ 5, 11-15.) The webpage through which Smith uploaded his book indicated that by clicking the "Publish" button, he was agreeing to Smashwords's "Terms of Service." (Def. 56.1 ¶ 16; Stris Decl., May 11, 2015, ECF No. 75-5, ¶ 5-6; Exh. C (Def.'s Req. Admis.), Stris. Decl., ECF No. 75-8, ¶¶ 5-10.) At that time, the Terms of Service provided that Smith was assigning to "Smashwords the non-exclusive worldwide right to digitally publish, distribute, market, and sell ('Publish') and to license others to do so, the work . . ." and the "right to distribute samples of the Work in any form of media . . ." (Def. 56.1 ¶ 19-20.) Smith retained the right to unpublish his work at any time by clicking an "unpublish" button on the Smashwords website. (Id.)

After Smith uploaded Hardscrabble to Smashwords, the book was listed for sale on the website. (Def. 56.1 ¶ 23.) Customers could also view a free sample of the book online or download it in a variety of formats. (Id. ¶¶ 24-26.) In addition, Smashwords furnished Hardscrabble to Defendant, pursuant to a contract under which Defendant distributed the eBooks of Smashwords's authors. (Def. 56.1 ¶ 27; Pl. 56.1 ¶ 13.) In addition to providing Defendant "the non-exclusive, worldwide right during the Term to sell, market, display, license, and promote" the Smashwords books, the agreement also gave Defendant the "right to distribute and display via download . . . up to five percent (5%) of an eBook's content . . . free as a sampler." (Def. 56.1 ¶ 33.) Pursuant to this agreement, Defendant listed Hardscrabble for sale on its website, and made a sample file of five percent or less available for free. (Id. ¶¶ 35-36.)

At the time Smith's book was listed, Barnes & Noble made it available to customers through a cloud-based system (the "Digital Locker" system). (Def. 56.1 ¶¶ 44-45) When customers logged into their accounts on the Barnes & Noble website, on Barnes & Noble's proprietary e-reader device, or on a software application, they could access eBooks they had purchased or free samples they had acquired. (Id. ¶ 45.) Each time a customer acquired digital content, a listing for that content was saved in the customer's personal "digital locker," appearing in the library of the e-reader, on the software, and on the customer's account on the website. (Id. ¶¶ 46-47.) When the customer selected the listing, the file would open. (Id. ¶ 48.) While the content could be stored locally on the e-reader, under certain situations—such as when it was short on storage space—the e-reader would automatically release the stored file to the cloud. (Id. ¶¶ 48-50.) In the event the content had been released to the cloud, it would re-download to the customer's device once she selected it from his digital locker. (Id. ¶ 50.) On June 12, 2010, for the first and only time, a Barnes & Noble customer ("the Customer") acquired a free sample of Hardscrabble from the website, and it was saved to her digital locker. (Id. ¶¶ 38-39.)

More than a year later, on October 27, 2011, Smith terminated his agreement with Smashwords. (Pl. 56.1 ¶ 15.) In addition to "unpublishing" Hardscrabble, he requested via email, "Please close my account 8immediately [sic]." (Exh. C (Smith and Smashwords emails), Am. Compl., ECF No. 8-3.) Smashwords replied, "[I]t's in your own best interest to wait a few months after you unpublish your titles before you request an account deletion," and in response, Smith reiterated that Smashwords should "comply with request." (Id.) After Smashwords asked for confirmation once more, and Smith sent an unresponsive answer, his account was deleted. (Id.; Def. 56.1 ¶ 60; Pl. Resp. Def. 56.1 Stmt., ECF. No. 76-1, ¶ 60.) Smith's act of unpublishing triggered a "takedown notice" in the Smashwords system, to be transmitted to retailers in the

4

next automated shipment. (Def. 56.1 ¶ 63; Exh. A (Dep. Mark Coker), Stris. Decl., at 86:17-22.) When Smith's account was deleted, so too was this "takedown notice." (Def. 56.1 ¶ 64.) As a result, Hardscrabble remained listed on Barnes & Noble's website even after Smith ended his agreement with Smashwords. (Def. 56.1 ¶ 66; Pl. 56.1 ¶ 16.) On April 20, 2012, Smith's lawyer sent notification to Defendant of copyright infringement and threatened legal action. (Def. 56.1 ¶ 68; Pl. 56.1 ¶ 16.) That same day, Defendant removed the listing from its website. (Def. 56.1 ¶ 69; Pl. 56.1 ¶ 16.)

At that time, it became impossible for anyone new to purchase Hardscrabble or acquire a free sample of it through Barnes & Noble's website. (Def. 56.1 ¶ 70.) However, Defendant did not remove the free sample of the book from the digital locker of the lone customer who had downloaded it. (Id. ¶ 70; Pl. 56.1 ¶ 18.) After the date Barnes & Noble received Smith's notice of copyright infringement, the free sample was re-downloaded to two distinct e-reader devices at two distinct IP addresses, both associated with the Customer's account. (Exh. B (Dep. David Bock), Pl.'s Mot. Summ. J., ECF No. 72-2, at 134:23-25, 135:10-19; Pl. Resp. 56.1 ¶ 72.) These downloads took place on May 28, 2012, and July 27, 2012. (Bock Decl., ECF No. 75-1 ¶ 28.)

Smith filed the instant action against Defendant on June 5, 2012, alleging direct copyright infringement, contributory copyright infringement, and unfair competition claims. (ECF No. 1.) Defendant filed its first motion for summary judgment on October 31, 2013. (ECF No. 27.) The Court granted summary judgment to Defendant on the unfair competition claim on September 23, 2014. (ECF No. 37.) Defendant filed its second motion for summary judgment on May 11, 2015. (ECF No. 69.) Plaintiff cross-moved for summary judgment the same day. (ECF No. 73.)

## LEGAL STANDARD

Summary judgment is appropriate where the movant shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden to demonstrate the absence of any genuine issues of material fact, and the court must "view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks omitted). However, speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact. Nat'l Union Fire Ins. Cor. Of Pittsburgh v. Walton Ins. Ltd., 696 F. Supp. 897, 900 (S.D.N.Y. 1988). If "no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servcs., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994).

Where the parties cross-move for summary judgment, the inferences and burdens of proof remain the same as those for a unilateral motion. See Straube v. Fla. Union Free Sch. Dist., 801 F. Supp. 1164, 1174 (S.D.N.Y. 1992). "That is, each cross-movant must present sufficient evidence to satisfy its burden of proof on all material facts." U.S. Underwriters Ins. Co. v. Roka LLC, No. 99 Civ. 10136 (AGS), 2000 WL 1473607, at *3 (S.D.N.Y. Sept. 29, 2000).

## DISCUSSION

### I. Direct Copyright Infringement

Defendant moves, and Plaintiff cross-moves, for summary judgment on the claim that Defendant directly infringed on Plaintiff's copyright. To establish a claim of direct copyright

infringement, the plaintiff must show: (1) that the plaintiff owns a valid copyright of the material at issue; and (2) that the third party infringed on the copyright by unauthorized copying or distribution.[2] Arista Records LLC v. Lime Group LLC 784 F.Supp 2d 398 (S.D.N.Y. 2011) (citing Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 256, 260 (2d Cir. 2005)). The holder of the copyright has the exclusive right to reproduce the copyrighted work in copies or phonorecords and to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending. 17 U.S.C. § 106.

Plaintiff alleges that Defendant infringed through both unauthorized reproduction and unauthorized distribution. (Pl.'s Mot. Summ. J. at 8-9.) Plaintiff argues that Defendant infringed on its exclusive reproduction right when the Customer "re-downloaded a sample of the Book" after the termination of the agreement between Plaintiff and Smashwords. (Pl.'s Mot. Summ. J. at 7.) She alleges that Defendant violated her exclusive distribution right at the moment of "the electronic transfer performed by the Customer." (Id. at 10.)

Plaintiff asserts that reproduction occurs when a copyrighted work is fixed in a new material object. (Pl.'s Mot. Summ. J. at 9, citing Matthew Bender & Co., Inc. v. W. Pub. Co., 158 F.3d 693, 703 (2d Cir. 1998)). In this Circuit, however, a showing of reproduction requires more than that. "When there is a dispute as to the author of an allegedly infringing instance of reproduction," courts must examine "the volitional conduct that causes the copy to be made." Cartoon Network LP, LLLP v. CSC Holdings, Inc., 536 F.3d 121, 131 (2d Cir. 2008). The plaintiff must prove that defendant "engaged in some volitional conduct sufficient to show that [it] actively" violated one of Plaintiff's exclusive rights. Capitol Records, LLC v. ReDigi Inc., 934 F. Supp. 2d 640, 657 (S.D.N.Y. 2013). As in Cartoon Network, the volitional element is

---

[2] The parties do not dispute, at this stage, that Plaintiff owned a valid copyright. (Def.'s Mot. Summ. J. at 10 n. 9.)

7

missing here, and this Court cannot "impose liability as a direct infringer on a different party for copies that are made automatically upon [the] customer's command." Id.

In Cartoon Network, defendant Cablevision unveiled a service through which its subscribers could select programming that Cablevision distributed in realtime under license from copyright owners and request that the programming be stored and subsequently transmitted to the users without a license from the copyright owners. 536 F.3d at 124. When a subscriber requested that a program be stored, the stream of data for that program was moved "onto a portion of one of the hard disks allocated to that customer." Id. It would then be streamed to the subscriber's home device upon request. Id. In examining these facts, the Cartoon Network court found two instances of volitional conduct: "Cablevision's conduct in designing, housing, and maintaining a system that exists only to produce a copy, and a customer's conduct in ordering that system to produce a copy of a specific program." Id. Faced with those two acts, the Court found that "the district court erred in concluding that Cablevision, rather than its . . . customers, makes the copies carried out by the . . . system." Id. While the Court did not dispute that Cablevision had "unfettered discretion in selecting the programming that it would make available for recording," it ultimately found that Cablevision's control was not "sufficiently proximate to the copying to displace the customer as the person who 'makes' the copies when determining liability under the Copyright Act."[3] Id. at 132.

While Cartoon Network addressed the volition requirement in the context of the exclusive rights of reproduction and public performance, subsequent courts have interpreted the

---

[3] In a dissent in another case, Justice Scalia indicated that he might find a defendant who selects the content to have engaged in volitional conduct. He wrote, "Video-on-demand services, like photocopiers, respond automatically to user input, but they differ in one crucial respect: *They choose the content.* . . . That selection and arrangement by the service provider constitutes a volitional act directed to specific copyrighted works and thus serves as a basis for direct liability." Am. Broad. Companies, Inc. v. Aereo, Inc., 134 S. Ct. 2498, 2513, 189 L. Ed. 2d 476 (2014) (emphasis in original). However, the majority opinion in that case did not address the volitional conduct requirement, and Cartoon Network remains controlling in this Circuit.

8

volitional conduct requirement to extend to the exclusive right of distribution. See, e.g., Wolk v. Kodak Imaging Network, Inc., 840 F. Supp. 2d 724, 741 (S.D.N.Y. 2012) aff'd sub nom. Wolk v. Photobucket.com, Inc., 569 F. App'x 51 (2d Cir. 2014) (Applying the volition requirement to the "exclusive rights to reproduce, produce derivative works and distribute the copyrighted images"); Zappa v. Rykodisc, Inc., 819 F. Supp. 2d 307, 315 (S.D.N.Y. 2011) ("Direct liability requires 'volitional conduct' that 'causes' the distribution to be made"); Arista Records LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124, 147 (S.D.N.Y. 2009) ("The line of cases on which the Cablevision court relied—beginning with Religious Technology Center v. Netcom On–Line Communication Services, Inc., 907 F. Supp. 1361 (N.D. Cal. 1995)—suggest that the volitional-conduct requirement should apply equally to all exclusive rights under the Copyright Act.").

Courts have also refined the definition of "volitional conduct" put forth in Cartoon Network. There, the court refrained from deciding "whether one's contribution to the creation of an infringing copy may be so great that it warrants holding that party directly liable for the infringement, even though another party has actually made the copy." Cartoon Network, 536 F.3d at 133. Since then, other courts have grappled with that question, attempting to "preserve[] a meaningful distinction between direct and contributory copyright infringement" while also holding defendants directly liable for copies made by other parties in extreme cases. BWP Media USA Inc. v. Hollywood Fan Sites, LLC, 69 F. Supp. 3d 342, 355 (S.D.N.Y. 2014). Courts have looked to the purpose and general use of the service in question, finding "volitional conduct" where a service or program was designed solely to collect and sell copyrighted material, ReDigi, 934 F. Supp. 2d at 657, and where a program collected material that its creators knew to be copyrighted. Capitol Records, Inc. v. MP3tunes, LLC, No. 07 Civ. 9931 (WHP), 2009 WL 3364036, at *3 (S.D.N.Y. Oct. 16, 2009).

Applying Cartoon Network to this case, there is no evidence of volitional conduct. Like Cablevision, Defendant designed, housed, and maintained a system—the Digital Locker system—through which it distributed licensed content to consumers. (Def. 56.1 ¶¶ 44-51.) Consumers could access digital content by locating the content on BarnesandNoble.com, selecting a free sample or an eBook, then storing that digital content through the digital locker system (Pl. 46.1 ¶ 16; Def. 56.1 ¶¶ 46-50), akin to Cablevision subscribers requesting that certain programs be saved to the portion of Cablevision's hard drive allotted to that customer. After the item was in her locker, a customer could request it and retrieve it either from her own personal device *or* by having it delivered to her device ("re-downloaded," in Plaintiff's terms), depending on whether the device had previously released the stored digital file to the cloud. (Def. 56.1 ¶ 48-50.) While Defendant had a license to distribute the content at the time the content was selected, that license may have expired by the moment of the re-download request. (Pl. Resp. 56.1 ¶ 72.) But, as in Cablevision, the lack of license at that later time does not mean Defendant engaged in volitional conduct sufficient to support a copyright infringement claim.

Plaintiff's case cannot be saved by the subsequent refinements to Cartoon Network. This is not a case where Defendant's "contribution to the creation of an infringing copy [is] so great that it warrants holding that party directly liable for the infringement, even though another party has actually made the copy." Cartoon Network, 536 F.3d at 133. While Defendant did host copyrighted material in its customers' digital lockers, it was licensed to do so; other than the Hardscrabble allegations, Plaintiff presents no evidence that Defendant hosted *unlicensed* copyrighted materials in its digital lockers.[4] This sets the instant case apart from those in which

---

[4] Plaintiff states, "The record is undisputable regarding the fact that B&N's misappropriation of residual Digital Locker rights was intentional, inherent, and an overt part of its business model, not only in Smith's case but in the case of all Smashwords' authors." (Pl.'s Mot. Summ. J. at 13). However, Plaintiff's citations in support of this assertion are inapposite. For example, Plaintiff cites to a Court Order stating, "Defendant's records show that one

defendants were found to have engaged in volitional conduct even though a user or customer "presses the button" to make the copy; in those cases, defendants actively encouraged and benefited from the infringing copying activity and in fact set up their services around such activity. See MP3tunes, 2009 WL 3364036, at *3 (citing Arista Records, 633 F. Supp. 2d at 148 (where defendants were aware of infringing digital music files on their service and took measures to increase retention of those songs and monitored newsgroups on the service, defendants were active participants); Playboy Enter., Inc. v. Russ Hardenburgh, Inc., 982 F. Supp. 503, 513 (N.D. Ohio 1997) (service that encouraged users to upload images and moved images to a generally available file was liable for direct infringement); CoStar Group, Inc. v. LoopNet, Inc., 373 F.3d 544, 555-56 (4th Cir. 2004) (website that allowed posting of commercial real estate properties and undertook a gatekeeping process to prevent obviously infringing photographs *not* liable for direct infringement where users posted infringing pictures)). Here, Defendant did not have a "fundamental and deliberate role," such that it was transformed "from a passive provider of a space in which infringing activities happened to occur to an active participant in the process of copyright infringement." ReDigi, Inc., 934 F. Supp. 2d at 657.

The lack of volitional conduct on Defendant's part precludes Plaintiff's claim for direct copyright infringement under a theory of reproduction. See Cartoon Network, 536 F.3d at 133. It also precludes Plaintiff's claim for direct copyright infringement under a theory of distribution, as the volitional conduct requirement applies equally to alleged infringements on any exclusive right. See Arista Records, 633 F. Supp. 2d at 147. Because of the lack of volitional conduct, the

---

customer acquired a sample of Plaintiff's book in June 2010, and accessed it again on at least seven different occasions between June 2010 and July 2012 when the customer re-downloaded the book from his or her digital locker onto his or her device." (Pl. 56.1, ¶ 3.) That has nothing to do with whether any author other than Plaintiff may have had his copyrights infringed upon. The Court agrees with Defendant that "the record contains no evidence of alleged violations with respect to authors other than Smith.") (Def. Mem. Law. Opp. at 4 n. 5.)

11

Court need not reach Defendant's argument that it was authorized to copy and distribute Hardscrabble under the parties' agreements or its abandonment and fair use defenses. This Court GRANTS Defendant's Motion for Summary Judgment and DENIES Plaintiff's Motion for Summary Judgment as to the direct copyright infringement claim.

II.     **Contributory Copyright Infringement**

The parties also move for summary judgment on the claim of contributory copyright infringement. To recover under this theory, "a plaintiff must first establish direct infringement by the relevant third party." Arista Records LLC v. Lime Grp. LLC, 784 F. Supp. 2d 398, 423 (S.D.N.Y. 2011). After that is established, "a defendant may be held liable for contributory copyright infringement if, with knowledge of the infringing activity, it materially contributes to the infringing conduct of [the third party.]" Id. at 432 (internal quotation marks omitted) (quoting Matthew Bender, 158 F.3d at 706). "The knowledge standard is an objective one; contributory infringement liability is imposed on persons who 'know *or have reason to know*' of the direct infringement." Energy Intelligence Grp., Inc. v. Jefferies, LLC, No. 14 Civ. 04115 (LAP), 2015 WL 1501107, at *7 (S.D.N.Y. Mar. 31, 2015) (emphasis in original) (quoting Arista Records, LLC v. Doe 3, 604 F.3d 110, 118 (2d Cir. 2010)). Evidence of actual and constructive knowledge may be found in "cease-and-desist letters, officer and employee statements, promotional materials, and industry experience." ReDigi, 934 F. Supp. 2d at 658 (citing A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1020-21, 1027 (9th Cir. 2001); Arista Records LLC v. Lime Grp. LLC, 784 F. Supp. 2d 398, 432 (S.D.N.Y. 2011); Arista Records LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124, 155 (S.D.N.Y. 2009)).

In addition to knowledge, the plaintiff must establish a "material contribution" by showing that the defendant: "(1) had actual or constructive knowledge of the infringing activity,

and (2) encouraged or assisted others' infringement, or provided machinery or goods that facilitated infringement." Lime Grp., 784 F. Supp. 2d at 432. Courts may find "material support" where "file-sharing systems provided the site and facilities for their users' infringement." ReDigi, 934 F. Supp. 2d at 658 (internal quotation marks removed) (citing Napster, 239 F.3d at 1022; Usenet, 633 F. Supp. 2d at 155). But while providing "the means to accomplish an infringing activity" may help establish the material contribution prong, it does not suffice to establish knowledge. Wolk, 840 F. Supp. 2d at 750 (internal alterations omitted) (quoting Livnat v. Lavi, No. 96 Civ. 4967 (RWS), 1998 WL 43221, at *3 (S.D.N.Y. Feb. 2. 1998).

Even "a defendant who distributes a product that materially contributes to copyright infringement will not be liable for contributory infringement if the product also is widely used for legitimate, unobjectionable purposes or is merely capable of substantial noninfringing use." Lime Grp., 784 F. Supp. 2d at 432 (internal quotation marks and alterations omitted) (quoting Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 442, 104 S. Ct. 774, 78 L. Ed. 2d 574 (1984)) (the "Sony-Betamax rule"). "The Sony-Betamax rule requires a court to determine whether a product or service is *capable* of substantial noninfringing uses, not whether it is currently used in a non-infringing manner." ReDigi, 934 F. Supp. 2d at 659 (emphasis in original) (citing Napster, 239 F.3d at 1021); see also Sony, 464 U.S. at 442 ("[T]he sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes. Indeed, it need merely be capable of substantial noninfringing uses.").

Plaintiff argues that material facts not in dispute establish that Defendant contributed to infringement of her copyright as a matter of law. (Pl.'s Mot. Summ. J. at 12.) At the outset, there

is no dispute that Hardscrabble was re-downloaded to two separate devices associated with the Customer's account after Smith had notified Barnes & Noble that he wanted the book removed. (Exh. B (Dep. David Bock), Pl.'s Mot. Summ. J., at 126.) Plaintiff classifies this as a clear instance of direct infringement on the part of the Customer, arguing that the Customer reproduced the book each time it was transmitted from the cloud back to her device. (Pl.'s Mot. Summ. J. at 12.) Defendant disputes that, arguing instead that "[t]he customer validly acquired a sample without restrictions, and merely accessed through Barnes & Noble's systems what she legitimately could have accessed elsewhere online." (Def. Resp. Opp'n, June 1, 2015, ECF No. 77, at 13.) Defendant further contends that even if the customer "technically created new material objects when twice refreshing the sample to devices associated with his or her Barnes & Noble account, this was not copyright infringement." (Id.)

Whether Customer's possibly unintentional redownload of a previously authorized sample constitutes "reproduction" is a thorny question. Other cases have established that the *unauthorized duplication* of digital files over the Internet infringes on copyright, see, e.g., Napster, 239 F.3d at 1014, and that "the *unauthorized transfer* of a file over the Internet—even where only one file exists before and after the transfer—constitutes reproduction within the meaning of the Copyright Act." ReDigi Inc., 934 F. Supp. 2d at 648 (emphasis added). But this case differs in several respects. First, the transfer of the book file was unquestionably authorized at the time of the initial download to the Customer's e-reader and subsequent transfers from the cloud to her e-reader prior to Smith ending his agreement with Smashwords. (Def. 56.1 ¶¶ 38-39.) Second, the transfer of the file was exclusively between the Customer's e-reader devices and the cloud; the book was never transferred from the cloud to a device associated with another account, nor did that possibility exist. (Def. 56.1 ¶ 70; Pl. 56.1 ¶ 72.) An individual may move

copyrighted material around on his personal hard drive without infringing on copyrights. See ReDigi, 934 F. Supp. 2d at 651 ("Any movement of copyrighted files on a hard drive, including relocating files between directories and defragmenting . . . is almost certainly protected under other doctrines or defenses."). To find that she may not move material between her personal hard drive and personal cloud-based digital locker without infringing would have far-reaching consequences for the many users of cloud-based storage systems like Dropbox or Apple's iCloud—particularly as it is not always clear to the user what is stored locally and what is stored in the cloud.[5] However, the Court need not decide now whether the Customer's actions in this case constituted infringement upon Plaintiff's copyright.

Even if the third party engaged in infringing conduct, Defendant cannot be held liable for contributory infringement because of the Sony-Betamax rule. It is clear that Defendant "provided the site and facilities" for the third party's alleged direct infringement, a factor relevant to establishing the material contribution prong of contributory infringement. ReDigi, 784 F. Supp. at 658. However, it is equally clear that Defendant's digital locker system "is *capable* of substantial non-infringing uses," Id. at 659 (emphasis in original), and indeed, that the system is used for "commercially significant noninfringing uses." Sony, 464 U.S. at 442. Defendant is a well-known bookseller that sells print and electronic books at retail establishments and through its website. (Def. 56.1 ¶ 28.) To facilitate that, Defendant's digital locker system is used to distribute purchased eBooks and free samples. (Id. ¶¶ 44-48.) In 2012, the year of the allegedly infringing redownloads, Defendant's web system was commonly used to distribute eBooks for which Defendant has legal licenses; at that time, Defendant's eBook store contained more than

---

[5] Here, for instance, "under certain circumstances, such as when the device is running out of space, the [device] may *automatically* release the stored digital file in order to conserve disk space . . . If that has occurred, clicking the icon will refresh the file from the cloud if the device is connected to the internet." (Def. 56.1 ¶¶ 49-50 (emphasis added).)

15

two million titles and controlled more than a quarter of the eBook market, and Defendant reported combined sales of its e-reader and digital content totaling $933.5 million. 2012 Barnes & Noble Ann. Rep., at 13, 15. This very case provides further evidence of the system's non-infringing capabilities: at the time the customer initially placed Hardscrabble in his digital locker, Defendant had a license to distribute the book. (Def. 56.1 ¶¶ 33, 38-39.) The digital locker system is capable of substantial non-infringing uses, and those uses are commercially significant.

This noninfringing capability sets Barnes & Noble apart from defendants who provided the site and facilities for infringement and were found liable under theories of contributory infringement. In ReDigi, defendants' computer program scanned customers' computers specifically for protected content, thus "ensur[ing] that *only* infringement occurred." 934 F. Supp 2d at 659. Faced with that, the court concluded that the "service is not capable of noninfringing uses," as the service, "by virtue of its design, is incapable with compliance with the law." Id. Under these circumstances, the service was not afforded any protection by the Sony-Betamax rule, and the court granted summary judgment in plaintiffs' favor. Indeed, noninfringing use must be near-impossible for summary judgment in favor of plaintiffs to be appropriate on this sort of claim. In Lime Grp., the court determined that the program in question was "used overwhelmingly for infringement," based on evidence showing more than 98 percent of downloaded files infringed on copyrights. 784 F. Supp. 2d at 412, 426. Even in that case, the court declined to grant summary judgment in plaintiffs' favor, as the court could not "determine, as a matter of law, whether LimeWire is capable of substantial non-infringing uses." Id. at 434.

Here, the service clearly is "capable of noninfringing uses" and is not "incapable of compliance with the law." ReDigi, 934 F. Supp. 2d at 659. Further, the Court is not faced with evidence that the service is "used overwhelmingly for infringement." Lime Grp., 784 F. Supp. 2d

at 426. Instead, the Court is faced with allegations of two infringing downloads of just one of the two million books in Defendant's repository. This does not support summary judgment in Plaintiff's favor. While Defendant did own the web service through which the alleged infringement took place, that does not suffice to establish contributory liability, given the rest of the facts. See Wolk, 840 F. Supp. 2d at 750-751 (granting summary judgment to Defendants on the grounds that plaintiff failed to establish that defendants encouraged copyright infringement or promoted their services as a means of circumventing copyright).

The facts do support summary judgment in Defendant's favor, under the Sony-Betamax rule. The digital locker system "is widely used for legitimate, unobjectionable purposes." Sony, 464 U.S. at 442. The fact that a single customer allegedly used it to download a sample of Hardscrabble and allegedly infringed on Plaintiff's copyright cannot support a claim for contributory copyright infringement. Therefore, Defendant's motion for summary judgment on this claim is GRANTED and Plaintiff's is DENIED.

## CONCLUSION

Defendant's motion for summary judgment is GRANTED. Plaintiff's motion for summary judgment is DENIED. The Clerk of Court is respectfully directed to enter judgment for the Defendant and close this case.

**SO ORDERED.**

Dated: November 2, 2015

New York, New York

HON. ANDREW L. CARTER, JR.
**United States District Judge**